**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| GREGORY KLEIN, individually and on behalf of all others similarly situated,<br>*Plaintiff*,<br>v.<br>LEMONADE, INC., a Delaware corporation, and LEMONADE INSURANCE AGENCY, LLC, a New York limited liability company,<br>*Defendants*. | Case No. 1:25-cv-5490<br>**CLASS ACTION COMPLAINT**<br>**JURY TRIAL DEMANDED** |

Plaintiff Gregory Klein ("Plaintiff"), individually and on behalf of all others similarly situated (the "Class" or "Class Members"), by and through undersigned counsel, brings this class action complaint against defendants Lemonade, Inc. and Lemonade Insurance Agency, LLC (collectively "Lemonade"). Plaintiff brings these allegations on information and belief, except the allegations specifically pertaining to himself, which are based on his personal knowledge.

## INTRODUCTION

1. In recognition of the sensitivity of driver's license information (and its utility to identity thieves), Congress passed the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.* (DPPA), which restricts access to driver's license information, and mandates that private companies may only use that information for limited, enumerated purposes.

2. In the DPPA, Congress specifically defines personal information (PI) to include driver's license numbers. *See* 18 U.S.C. § 2725(3). Thus, under the DPPA, private companies are legally prohibited from accessing, or provide access to, driver's license numbers except for very specific purposes.

3. Threat actors seek out driver's license numbers because they are highly valuable pieces of PI. A driver's license number can be a critical part of a fraudulent, synthetic identity, with reports indicating that the going rate for a stolen identity is about $1,200 on the dark web, and that a stolen or forged driver's license, alone, can sell for around $200.[1] Driver's license numbers are particularly useful to identity thieves for applying for unemployment or other government benefits.

4. Defendants are a provider of private passenger automobile insurance policies (among other types of insurance policies) and offer coverages to automobile insureds throughout the United States. Defendants tout themselves as a "new kind of car insurance" which uses location-based technology to provide better, more affordable rates.[2] Defendants market their insurance policies through the Lemonade website, which contains an online quoting platform ("Quote Platform") through which prospective customers can apply for insurance coverage and receive a quote from Defendants online.

5. Despite knowing that driver's license numbers can only be used and disclosed for specific enumerated purposes, Defendants knowingly and willfully designed and implemented a feature on their Quote Platform through which an individual's driver's license number would auto-populate in the Quote Platform or otherwise become viewable by the public. This was possible after only a bare minimum of publicly available information was entered about an individual (i.e., name, address, etc.). And the auto-populated driver's license number was then visible to users of Defendants' Quote Platform, despite the fact that such users had no permissible purpose to access

---

[1] Lee Mathews, *Hackers Stole Customers' License Numbers From Geico In Months-Long Breach,* FORBES (Apr. 20, 2021), https://www.forbes.com/sites/leemathews/2021/04/20/hackers-stole-customers-license-numbers-from-geico-in-months-long-breach/?sh=146576a68658.

[2] *See* LEMONADE, https://www.lemonade.com/car (last visited June 27, 2025).

or view driver's license numbers and Defendants made no attempt to verify that those auto-populated driver's license numbers were shown to only the individuals to whom they belonged.

6. Defendants implemented this feature for their own self-interest: to increase the likelihood that consumers would complete their applications and purchase insurance policies through the Quote Platform. By automatically pre-filling consumers' driver's license numbers, Defendants sidestepped the process of asking Quote Platform visitors to fill in those numbers themselves. That reduced the time and effort required to complete the application process, thus selling more insurance, but they did so at the cost of disclosing individuals' highly sensitive driver's license numbers.

7. Nothing about Defendants' underwriting or insurance quoting process required them to auto-populate driver's license numbers on their website. Indeed, on information and belief, Defendants had offered online insurance quotes to applicants long before they incorporated this auto-population feature to their Quote Platform. Instead, Defendants added the auto-population feature to gain a competitive advantage in their sales process. That is, the less information requested from the prospective customer, the more likely they are to finish the application and purchase insurance from Defendants. Thus, Defendants' conduct was motivated by their desire to entice customers to complete applications for insurance.

8. By knowingly and intentionally designing and implementing the auto-population feature on their Quote Platform, Defendants knowingly and intentionally obtained, used, and disclosed Plaintiff's and Class Members' driver's license numbers (and other PI) on their Quote Platform. Defendants' decision made driver's license numbers and other PI easily accessible to anyone who entered a prospective customer's basic information.

9. Defendants designed their Quote Platform and website to display driver's license numbers and other PI to any website user who entered basic information about someone—regardless of whether the user was the person to whom the sensitive information relates. Defendants did not implement or maintain any effective security processes or systems to prevent unauthorized parties and/or automated bots from using Defendants' website to harvest consumers' PI through their Quote Platform.

10. In essence, in their pursuit of selling more insurance and improving their bottom line, Defendants intentionally created a website that allowed anyone to look up someone's driver's license number and other PI, merely by entering rudimentary information about such a person. Defendants posted Plaintiff's and the class members' driver's license numbers and PI on the internet's "windshield," making the information visible to all digital passersby.

11. Unsurprisingly, Defendants' profit-seeking conduct quickly caught the attention of opportunists, who utilized Defendants' Quote Platform to obtain highly sensitive driver's license numbers and PI of approximately 190,000 consumers, including Plaintiff (the "Data Disclosure").[3]

12. Defendants sent letters to individuals impacted by the Data Disclosure beginning in or about April 2025 (the "Notice"), stating that:

> Lemonade offers car insurance policies through an online application process at www.lemonade.com/car (the "Online Flow"). Using the Online Flow to obtain an insurance quote and purchase a policy, an individual enters certain information—name, date of birth, and residential address. Using this information, Lemonade calls for and returns from its third-party vendor that individual's driver's license number. On March 14, 2025, we learned that due to a vulnerability in our Online Flow, certain driver's license numbers for identifiable individuals were likely exposed.

***

---

[3] LEMONADE, INC., Current Report (Form 8-K) (SEC filed Apr. 4, 2025), https://www.sec.gov/ix?doc=/Archives/edgar/data/0001691421/000169142125000053/lmnd-20250404.htm.

> Lemonade believes that the unauthorized exposures spanned from approximately April 2023 through September 2024.[4]

13. In the Notice, Defendants acknowledged that driver's license numbers and other PI accessed through the Data Disclosure can be used to conduct various forms of fraud and identity theft and urged impacted individuals to "remain vigilant with respect to reviewing [their] account statements and credit reports, and […] promptly report any suspicious activity or suspected identity theft to the proper law enforcement authorities."[5]

14. The information, used by the unauthorized third parties to obtain Plaintiff's and Class Members' driver's license numbers and PI from Defendants' Quote Platform, was simply their names, addresses, and other similar contact information (commonly referred to as "phone book" information) publicly available through a simple Google search or in databases widely available on the internet.

15. Defendants' Notice explains that the Data Disclosure occurred from April 2023 through September 2024 but was only discovered by Defendants on March 14, 2025. This means Defendants failed to discover—or inform Plaintiff and Class Members of—the Data Disclosure for nearly two years after it began.

16. Defendants sent a Notice to Plaintiff confirming that Plaintiff's sensitive driver's license number and PI were likely obtained by Defendants, displayed or otherwise disclosed on Defendants' website through the Quote Platform, and ultimately accessed by cybercriminals. Defendants use the Quote Platform to attract and obtain new business and increase their revenue and profit.

---

[4] Lemonade Template Notice of Data Breach, to Cal. Off. of the Att'y Gen. (Apr. 11, 2025), https://oag.ca.gov/system/files/Template%20Individual%20Notice%20%28Version%201%29.pdf.
[5] *Id.*

17. As a result of Defendants' intentional conduct in obtaining, using, and disclosing Plaintiff's and Class Members' driver's license numbers and other PI on their Quote Platform for all to see, and the resulting Data Disclosure, Plaintiff's privacy has been invaded, Plaintiff's sensitive driver's license information is now in the hands of unauthorized third parties, and Plaintiff faces a substantially increased risk of identity theft and fraud. Accordingly, Plaintiff now must take immediate and time-consuming action to protect against identity theft and fraud.

18. To redress Defendants' illegal, self-interested, profit-seeking conduct, Plaintiff brings this class action individually and on behalf of Class Members who had their driver's license numbers and other PI obtained by Defendants, displayed or otherwise disclosed on Defendants' website through the Quote Platform, used by Defendants to attract and obtain new business and increase their revenue and profit, and ultimately accessed by cybercriminals via the Data Disclosure. Plaintiff, individually and on behalf of the Class Members, seeks remedies, including monetary damages and injunctive relief (including relief under the federal Declaratory Judgment Act), for negligence, invasion of privacy, violations of the N.Y. Gen. Bus. Law § 349, and Defendants' violations of the DPPA.

## THE PARTIES

19. **Plaintiff Gregory Klein** is a resident and citizen of the State of New York.

20. **Defendant Lemonade, Inc.** is a domestic for-profit corporation organized under the laws of Delaware, with its principal place of business in New York, New York.

21. **Defendant Lemonade Insurance Agency, LLC** is a domestic limited liability company organized under the laws of New York, with its principal place of business in New York, New York. Defendant Lemonade Insurance Agency, LLC is a subsidiary of Lemonade, Inc.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 as it arises under the laws of the United States, including the Driver's Privacy Protection Act, 18 U.S.C. §§ 2721, *et seq.*

23. This Court also has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

24. Alternatively, this Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate amount in controversy exceeds $5 million, exclusive of interest and costs; the number of members of the proposed Class exceeds 100; and diversity exists because upon information and belief, at least one Class Member and Defendants are citizens of different states.

25. The Court has personal jurisdiction over Defendants because they maintain their headquarters and principal places of business in this District and conduct significant business in this District, thus availing themselves of New York's markets by selling auto insurance policies therein; they have sufficient minimum contacts with New York; and a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District.

26. Venue properly lies in this District pursuant to 28 U.S.C. § 1391 because, *inter alia*, a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in, were directed to, and/or emanated from this District; Defendants transact substantial business and have agents in this District; a substantial part of the conduct giving rise to Plaintiff's claims occurred in this District; and because Defendants' corporate headquarters are located within this District.

## FACTUAL ALLEGATIONS

**A. Plaintiff Was Impacted by Defendants' Actions.**

27. Lemonade sent Plaintiff Klein a letter in or about April 2025, informing Plaintiff that Lemonade disclosed Plaintiff's driver's license number to unauthorized third parties through Lemonade's Quote Platform.

28. Prior to April 2025, Plaintiff was a homeowner's insurance customer of Lemonade for over five years.

29. Plaintiff has spent considerable time and effort and taken (and continues to take) considerable precautions to monitor for and protect against the unauthorized dissemination of Plaintiff's driver's license number and PI. To date, Plaintiff has spent hours researching the breach, freezing credit through Experian and Equifax, monitoring financial accounts, sorting through significant spam, and otherwise dealing with the fallout of the Data Disclosure. Unfortunately, because of Defendants' practice of unlawfully obtaining, using, and disclosing Plaintiff's PI, Plaintiff's sensitive PI was disseminated without his consent, is at high risk of being fraudulently used by unauthorized third parties, and the value of that information was quantifiably reduced.

30. Plaintiff is very careful about sharing PI and has never knowingly transmitted unencrypted PI over the internet or any other unsecured source. Further, Plaintiff stores documents containing PI in a secure location and takes steps to ensure all online accounts are secure and password protected.

31. As a result of Defendants' Data Disclosure, Plaintiff has suffered—or is at an increased risk of suffering—injury and/or damages, including, but not limited to, the unauthorized use of the disclosed PI, heightened threat of identity theft and general mitigation efforts spent on monitoring credit and for identity theft; time and expenses spent scrutinizing bank statements,

credit card statements, and credit reports for fraudulent transactions/conduct; time and expenses spent monitoring bank accounts for fraudulent activity; loss in value of personal data; lost property in the form of the compromised PI; and injury to Plaintiff's privacy.

32. Additionally, because of Defendants' Data Disclosure, Plaintiff now faces a substantial risk that unauthorized third parties will further misuse Plaintiff's PI. Indeed, (1) the Data Disclosure involved unauthorized third parties specifically targeting Defendants' systems (i.e., the online Quote Platform); (2) the dataset of PI the unauthorized third parties obtained from Defendants' disclosure through its Quote Platform is likely to be misused for fraudulent and/or unauthorized conduct; and (3) the type of PI Defendants disclosed and the unauthorized third parties obtained in the Data Disclosure—i.e., mainly driver's license numbers—are highly sensitive and can be misused for substantially injurious forms of identity and/or fraud, such as (*inter alia*) fraudulently applying for and obtaining unemployment benefits or loans and opening bank accounts. As a result, Plaintiff has (1) suffered, or is at an increased risk of suffering, unauthorized use of Plaintiff's disclosed PI such that Plaintiff has suffered concrete injury; (2) suffered concrete injury in fact based on the material risk of future misuse of Plaintiff's PI and concrete harm by exposure to this risk; and (3) experienced separate concrete, present harm caused by Plaintiff's exposure to the risk of future harm due to lost time Plaintiff spent taking protective measures that would have otherwise been put to other productive use and lost opportunity costs associated with the time and effort Plaintiff expended addressing future consequences of the Data Disclosure.

33. Plaintiff experienced all of the foregoing harm and injury as a direct result of Defendants' knowing and voluntary disclosure of Plaintiff's PI in the Data Disclosure. The monetary relief sought herein by Plaintiff would compensate for the foregoing redressable injuries.

Further, Plaintiff seeks injunctive relief to redress the foregoing injuries and harm, including, but not limited to, requiring Defendants to take steps to monitor for, protect, and/or prevent misuse of the PI that Defendants disclosed in the Data Disclosure, as well as enact adequate data privacy/security practices.

**B. Defendants Collect Vast Amounts of Sensitive PI from Consumers and Third Parties.**

34. Defendants primarily offer private passenger automobile and other types of insurance throughout the United States of America. Defendants also offer renters' insurance, homeowners' insurance, pet insurance, and life insurance.[6]

35. Defendants collect and store vast amounts of PI and sensitive data from prospective clients, current and former customers, and other consumers, including highly sensitive driver's license numbers, as well as, on information and belief, names, aliases, postal addresses, Social Security numbers, bank account numbers, credit card numbers, protected classification characteristics, geolocation data including physical location, and/or job history. Discovery will show that during the insurance claims process, Defendants also require submission of similar PI in connection with insurance processing claims, including from individuals who are not Defendants' policyholders but who are involved in a claim being handled by Defendants, such as drivers involved in accidents with Defendants' insureds.

36. Defendants' marketing is primarily through direct response methods in which consumers submit applications for insurance quotes directly to Defendants via the internet or by telephone.

37. Competition for private passenger automobile insurance, which is substantial, tends to focus on price and level of customer service provided.

---

[6] *See* LEMONADE, https://www.lemonade.com/?f=1 (last visited June 27, 2025).

38. Like other insurance providers, Defendants have an online Quote Platform available to all persons capable of accessing it via the internet. Visitors to Defendants' Quote Platform can get a quote instantly after providing basic PI.

39. Defendants' quoting feature uses the information entered by the website visitor, combined with additional information Defendants have or that Defendants can access from third-party data brokers, and then automatically displays the additional information to the visitor as part of the quote process.

40. Specifically, at certain times, including during the time the data was disclosed, Defendants' quoting feature asked any user for their name, date of birth, and address. Once a visitor entered that information, Defendants' system auto-populated the quotation with driver's license information from Defendants' own databases or from third-party prefill services and made that information visible to the person entering the information on the Defendants' Quote Platform. A person's name, date of birth, and address are data that are often easily obtained. Defendants knew that this information was often available to the public at no cost, and that cybercriminals are commonly in possession of basic data combinations, including name, address, and date of birth.[7]

41. Given that Defendants' website functioned as a driver's license lookup tool, on information and belief, scammers used an automated process on Defendants' instant Quote Platform to harvest Plaintiff's and Class Members' driver's license numbers.

---

[7] For example, "[s]ince approximately 2009, MyLife has purchased public record data about individuals from data brokers. … MyLife uses that data to create a 'public listing' or profile for these individuals, which can be accessed through its website, www.mylife.com. … On its website, MyLife has profiles purporting to cover at least 320 million individuals. ... Information that may be available through a *free search may include: name; city and state of residence; ... email address, and mailing address associated with the profile; date of birth ….*" *United States v. MyLife.com, Inc.*, No. CV 20-6692-JFW(PDX), 2021 WL 4891776, at *2 (C.D. Cal. Oct. 19, 2021) (citations omitted) (emphasis added).

42. On information and belief, the proposed Class may include people who never applied for insurance with Defendants, were not Defendants' customers, and may not even have been aware of Defendants' existence. In other words, unauthorized parties may have availed themselves of the PI Defendants made publicly available via their instant Quote Platform on a wholesale basis.

43. Defendants' Quote Platform did not require verification that the person or automated process accessing the system was actually the individual for whom the information was being entered. In addition, Defendants' Quote Platform did not employ effective, industry-standard security measures to detect whether the website visitor was, in fact, a "bot" or automated process rather than an individual person. Instead, Defendants knowingly and intentionally configured their online Quote Platform to provide PI—including driver's license numbers—when anyone, including bots, just entered basic information such as a person's name, date of birth, and address. Thus, Defendants' Quote Platform was purposefully and knowingly set up to allow any site visitor, including bots, to access and view PI including driver's license numbers of anyone about whom Defendants had collected or could access that PI simply so that Defendants could more easily sell their main product.

**C. Defendants Contravened the Purpose of the Driver's Privacy Protection Act.**

44. Prior to the enactment of the DPPA, Congress found that most states freely turned over DMV information to whomever requested it with few restrictions. 137 Cong. Rec. 27,327 (1993).

45. Due to this lack of restrictions, Congress grew concerned that potential criminals could easily obtain the private information of potential victims. 140 Cong. Rec. 7929 (1994) (statement of Rep. Porter Goss).

46. These concerns did, in fact, materialize in the occurrence of crime, harassment, and stalking. Most notably, in 1989, a stalker shot and killed Rebecca Schaeffer, an upcoming actor, after obtaining her unlisted home address from the California DMV. 137 Cong. Rec. 27,327 (1993). In advocating for the DPPA, Representative Jim Moran (D-VA) recounted thieves using information from the DMV to learn home addresses and commit burglary and theft. *Id*. Similarly, Senator Barbara Boxer (D-CA) explained how a man used the DMV to obtain the home addresses of several young women and sent them harassing letters. 39 Cong. Rec. 29,466 (1993). In another instance, a woman who visited a clinic that performed abortions found black balloons outside her home after a group of anti-abortion activists sought to harass her upon seeing her car in the clinic's parking lot. 139 Cong. Rec. 29,462 (1993) (statement of Sen. Chuck Robb).

47. In response to public outrage over the Schaeffer murder and growing concern for the threat to public safety that free access to DMV records posed, Congress enacted the DPPA "to protect the personal privacy and safety of licensed drivers consistent with the legitimate needs of business and government." S. Res. 1589, 103rd Cong. §1(b), 139 Cong. Rec. 26,266 (1993) (enacted).

48. Additionally, in enacting the DPPA, Congress was motivated by its "[c]oncern[] that personal information collected by States in the licensing of motor vehicle drivers was being released — even sold — with resulting loss of privacy for many persons." *Akkawi v. Sadr*, No. 20-CV-01034-MCE-AC, 2021 WL 3912151, at *4 (E.D. Cal. Sept. 1, 2021) (citing *Maracich v. Spears*, 570 U.S. 48, 51–52 (2013) (alterations in original)). The release of private information like driver's license numbers and other motor vehicle records was the exact impetus for the DPPA's passage.

49. Congress sought to expressly prohibit "disclosing personal information obtained by the department in connection with a motor vehicle record …." *Chamber of Com. of United States v. City of Seattle*, 274 F. Supp. 3d 1140, 1154 (W.D. Wash. 2017). Driver's license numbers are thus explicitly listed as "personal information" from "motor vehicle records" under the DPPA. *See* 18 U.S.C. 2725(1), (3). As such, Congress used its lawmaking authority to properly elevate the disclosure driver's license numbers and other motor vehicle records into a concrete harm, a harm that bears a sufficiently close relationship to the tort of public disclosure long recognized at common law.

50. By knowingly using the PI of Plaintiff and the Class for sales and marketing purposes, and by knowingly disclosing that PI to the public, Defendants ran afoul of the purpose of the DPPA, and threatened the privacy and safety of licensed drivers, for whose protection the statute was enacted. Defendants' actions constituted a concrete injury and particularized harm to Plaintiff and members of the Class, that would not have happened but for Defendants' failure to adhere to the DPPA. Plaintiff was harmed by the public disclosure of Plaintiff's PI in addition to the other harms enumerated herein.

**D. Defendants Used and Disclosed Sensitive PI.**

51. In its Notice, Defendants informed consumers that their sensitive PI—namely, driver's license numbers—was compromised in a security incident, which it described as follows:

> On March 14, 2025, we learned that due to a vulnerability in our Online Flow, certain driver's license numbers for identifiable individuals were likely exposed.
>
> ***
>
> Lemonade believes that the unauthorized exposures spanned from approximately April 2023 through September 2024.[8]

---

[8] *Notice of Data Breach*, *supra* note 4.

52. While the Notice indicates that "[w]e promptly took steps to eliminate the vulnerability," the Notice does not provide the reason why it took Defendants nearly two years to discover the "vulnerability," or how it discovered the vulnerability nearly six months after the exposures purportedly ceased.[9]

53. Further, although Defendants' Notice Letter states "we are not currently aware of any *misuse* of your information as a result of this incident,"[10] it does not state that the information has not been *obtained* by any third parties. Considering the various entities who have targeted other insurance companies' nearly identical online quote tools, as set forth below, Plaintiff believes that the information disclosed in the Data Disclosure was also obtained and viewed by unauthorized third parties.

54. Defendants' use of the driver's license numbers, their Data Disclosure through their online sales platform, and their violation of the law—including the DPPA—assisted an ongoing and concerted campaign by fraudsters to engage with insurers' Quote Platforms to obtain driver's license numbers.

55. On February 16, 2021, the New York State Department of Financial Services (DFS) issued an alert regarding an ongoing systemic and aggressive campaign to engage with public-facing insurance websites—particularly those that offer instant online automobile insurance quotes like Defendants' website—to obtain non-public information, in particular unredacted driver's license numbers.[11] According to the alert, the unauthorized collection of driver's license numbers appeared to be part of a growing fraud campaign targeting pandemic and unemployment benefits.

---

[9] *Id.*
[10] *Id.* (emphasis added).
[11] N.Y. DEP'T OF FIN. SERV., Industry Letter Re: Cyber Fraud Alert (Feb. 16, 2021), https://www.dfs.ny.gov/industry_guidance/industry_letters/il20210216_cyber_fraud_alert#_edn.

DFS first became aware of the campaign when it received reports from two auto insurers in December 2020 and January 2021 that cybercriminals were targeting their websites that offer instant online automobile insurance quotes to obtain unredacted driver's license numbers.

56. Insurers' instant online auto quoting websites are the primary entry point for cybercriminals to access consumers' PI. As the industry has accelerated adoption of faster-quoting processes and tools to achieve competitive advantage, new vulnerabilities have opened.[12] According to DFS, insurers noticed an unusually high number of abandoned quotes or quotes not pursued after the display of the estimated insurance premium. On the instant quote websites, "criminals entered valid name, any date of birth and any address information into the required fields" and "then displayed an estimated insurance premium quote along with partial or redacted consumer [PI] including a driver's license number. The attackers captured the full, unredacted driver's license numbers without going any further in the process and abandoned the quote."[13] Of course, Defendants need not use driver's license numbers on a sales platform, or disclose this information to the public, to underwrite any auto insurance policy.

57. In January 2021, DFS alerted approximately a dozen entities maintaining such websites that they were likely targets of unauthorized third parties looking to gain access to New Yorkers' PI, specifically driver's license numbers. Following the alert, six more insurers apparently reported to DFS the malicious targeting of their websites—two of which insurers reported that the fraudsters failed to gain access to PI, and four of which reported that the fraudsters did gain access to PI or that their investigation was still ongoing. In the alert, DFS did not name the websites affected or the insurers.

---

[12] *Id.*

[13] *Id.*

58. The DFS issued a second alert on March 30, 2021, urging companies like Defendants to avoid displaying prefilled driver's license numbers "considering the serious risk of theft and consumer harm."[14]

59. The increase in interest in driver's license numbers is, in part, a product of the changes brought on by the COVID-19 pandemic, as various types of financial transactions that used to be conducted exclusively in person have been transferred online. Some states were also allowing residents to use expired driver's licenses for various purposes for an extended period, due to difficulty in securing the in-person DMV appointments necessary to renew them.[15]

60. Unsurprisingly, fraudulent unemployment claims spiked during the pandemic, as more money became available to displaced workers and the requirements for filing eased. Many states even paid out tens of millions of dollars to scammers, a phenomenon largely driven by the unauthorized use of fraudulently obtained PI. Threat actors have been caught using not just sensitive personal data for these fraudulent unemployment claims, but also hacking into existing unemployment accounts to change bank payment information.[16]

61. A normal yearly cost for fraudulent unemployment claims is about $3 billion; recent reports indicate that this number ballooned to $200 billion during the pandemic.[17] Fraudulent first-time claims drove a lot of this activity, but experts expect the problem to persist

---

[14] N.Y. DEP'T OF FIN. SERV., Industry Letter Re: Cyber Fraud Alert Follow-Up (Mar. 30, 2021), https://www.dfs.ny.gov/industry_guidance/industry_letters/il20210330_cyber_alert_followup.

[15] Scott Ikeda, *Geico Data Breach Leaks Driver's License Numbers, Advises Customers to Watch Out for Fraudulent Unemployment Claims*, CPO MAGAZINE (Apr. 23, 2021), https://www.cpomagazine.com/cyber-security/geico-data-breach-leaks-drivers-license-numbers-advises-customers-to-watch-out-for-fraudulent-unemployment-claims/.

[16] *Id.*

[17] Megan DeMatteo, *Unemployment fraud costs victims $200 billion annually in the U.S.—here's how to protect yourself*, CNBC SELECT (Dec. 3, 2023), https://www.cnbc.com/select/how-to-protect-yourself-from-unemployment-fraud/.

even as most Americans are back to work. Some will fail to notify the state unemployment office of their change in employment status, creating an opening for scammers.

62. Defendants knew that they were using driver's license information on their online sales platform. Defendants also knew that this platform was created and maintained in a way that allowed fraudsters to plug in readily, publicly available basic PI of other persons, and that the website would auto-populate driver's license information once that basic information was entered. Indeed, Defendants were responsible for their Quote Platform, including its design and design features. Defendants thus knew or should have known, that their website and the website's auto-populate feature disclosed consumers' driver's license number to unauthorized third parties. This is exactly how Defendants designed their website to operate. Not only did Defendants know that they were using driver's license numbers to sell insurance, and that they were disclosing driver's license numbers to the public, but they also failed to assess reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of consumers' PI, and failed to implement basic safeguards to protect the security, confidentiality, and integrity of that information. By adding the auto-population feature to their Quote Platform, which Defendants knowingly and intentionally chose to do, Defendants intended to use the driver's license numbers and make the returned information easily accessible to anyone who entered basic information into their system. Defendants did not impose any security protocols to ensure that website visitors entered and accessed PI only about themselves. Defendants did not impose effective security protocols to prevent automated bots from accessing consumers' PI. Thus, Defendants knowingly used and posted consumers' driver's license numbers directly to all members of the public.

### E. Defendants Acknowledged That the Use of Data and Their Data Disclosure Created a Substantial Risk of Identity Theft and Fraud.

63. The extent, scope, and impact of Defendants' use of the data and their Data Disclosure on their customers and other consumers remains uncertain. Nevertheless, the harm

caused to Plaintiff and Class Members by Defendants' use of the information and their Data Disclosure is already apparent. Criminals may now possess Plaintiff's and Class Members' driver's license numbers, and their only purpose in obtaining and possessing that information is to monetize that data by selling it on the darknet or dark web or using it to commit other types of fraud.

64. Defendants' Notice puts the burden on Plaintiff and Class Members to take mitigating steps to protect their information, including freezing their credit and vigilantly monitoring their financial accounts and credit, among other actions.

65. Having received the Notice about this Data Disclosure, it is reasonable for Plaintiff and Class Members to believe that the risk of future harm (including identity theft or fraud) is substantial and imminent, and to take steps to mitigate that substantial risk of future harm. Defendants' specific instructions and warnings in the Notice encourage recipients to report any suspicious activity, *or suspected identity theft* to the proper law enforcement authorities.

**F. The PI Defendants Obtained, Used, and Then Disclosed in Their Data Disclosure Is Highly Valuable to Fraudsters.**

66. It is well known among companies that store or have access to sensitive PI that driver's license numbers are valuable and frequently targeted by criminals. The PI that Defendants voluntarily disclosed via their Quote Platform in violation of state and federal law is very valuable to phishers, identity thieves, cyber criminals, and other fraudsters, especially as unprecedented numbers of criminals are filing fraudulent unemployment benefit claims, and driver's license information is uniquely connected to the ability to file such claims and commit other financial fraud. Unsecured sites that contain or transmit PI like driver's license numbers require notice to consumers when the data is stolen because it can be used to commit identity theft and other types of fraud.

67. The driver's license numbers disclosed in Defendants' Data Disclosure are significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. By contrast, the information disclosed in Defendants' Data Disclosure can be used to *open* fraudulent bank accounts and credit and debit cards, or to take out loans, especially student loans. The driver's license numbers disclosed in Defendants' Data Disclosure are also more valuable because they are long lasting, and difficult, if not impossible, to change.

68. With access to an individual's driver's license number, criminals can commit all manner of fraud, including: obtaining government benefits in the victim's name, filing fraudulent tax returns using the victim's information, or obtaining a driver's license or official identification card in the victim's name but with the thief's picture. In addition, identity thieves may obtain a job, rent a house, or receive medical services in the victim's name, and may even give the victim's driver's license number during an arrest, resulting in an arrest warrant being issued in the victim's name.[18] They can also use the driver's license when receiving a ticket or to provide to an accident victim, to replace or access account information on social media sites, to obtain a mobile phone, to dispute or approve a SIM swap, to redirect U.S. mail, to gain unauthorized access to the United States, to claim a lost or stolen passport, to use as a baseline to obtain a Commercial Driver's License, or to engage in phishing or other social engineering scams.

69. Fraudsters often aggregate information taken from data security incidents to build profiles on individuals. These profiles combine publicly available information with information discovered in previous data security incidents and exploited vulnerabilities. Unique and persistent

---

[18] *See* FED. TRADE COMM'N, *Warning Signs of Identity Theft*, https://www.identitytheft.gov/Warning-Signs-of-Identity-Theft (last visited June 27, 2025).

identifiers such as Social Security numbers, driver's license numbers, usernames, and financial account numbers (e.g., credit cards, insurance policy numbers, etc.) are critical to forging an identity. When not all information is available, the information that is stolen is used to socially engineer a victim into providing additional information so a "fullz"[19] profile can be obtained.

70. There is no legitimate or legal reason for anyone to use Defendants' website to acquire driver's license information on Plaintiff and the Class Members. Dark Net Markets, or the "dark web," is a heavily encrypted part of the internet that is not accessible via traditional search engines. Law enforcement has difficulty policing the dark web due to this encryption, which allows users and criminals to conceal identities and online activity. When malicious actors obtain ill-gotten PI, that information often ends up on the dark web because the malicious actors buy and sell that information for profit.[20] "Why else would hackers . . . steal consumers' private information? Presumably, the purpose of the hack is, sooner or later, to make fraudulent charges or assume those consumers' identities." *Remijas v. Neiman Marcus Grp., LLC*, 794 F.3d 688, 693 (7th Cir. 2015).

71. Any non-public data, especially government-issued identification numbers like a driver's license or non-driver's identification number, has criminal value.[21] For example, a fake U.S. citizenship kit for sale—passport, Social Security number, driver's license, and birth certificate—is offered on the dark web for 0.218 bitcoin (or $1,400 at the time) and a stolen/fake

---

[19] "Fullz" is a slang term used by threat actors and various criminals meaning "full information," a complete identity profile or set of information for an entity or individual.

[20] IDENTITYFORCE, *Shining a Light on the Dark Web with Identity Monitoring* (Feb. 1, 2020), https://www.identityforce.com/blog/shining-light-dark-web-identity-monitoring (last visited June 27, 2025).

[21] IDENTITY THEFT RESOURCE CTR., *Can Someone Steal Your Identity From Your Driver's License?* (Apr. 16, 2025), https://www.idtheftcenter.org/can-someone-steal-your-identity-from-your-drivers-license/ (last visited June 27, 2025).

driver's license (by U.S. state) for $200 in bitcoin.[22]

72. In some ways, driver's license numbers are even more attractive than Social Security numbers to threat actors and more dangerous to the consumer when disclosed. Unlike a Social Security number, a driver's license number is not monitored as closely, so it can potentially be used in ways that will not immediately alert the victim. Threat actors know this as well. Because driver's licenses contain, or can be used to gain access to, uniquely qualifying and comprehensive identifying information such as eye color, height, weight, sex, home address, medical or visual restrictions, and living will/health care directives, most insurance and credit agencies highly recommend immediate notice and replacement, and that identity theft protections are put in place for a minimum of three years. Most cybersecurity experts, including Enterprise Knowledge Partners, recommend five years or more.

73. Blogger Gayle Sato from the national credit reporting company Experian emphasized the value of driver's license information to thieves and cautioned:

> Your driver's license may not seem like a jackpot for thieves, but it can be used to create fake driver's licenses, open accounts in your name, avoid traffic tickets or collect government benefits such as unemployment checks. Worse, if your license data has been stolen in a data breach, you may not even know it's being misused.[23]

74. In fact, according to the data privacy and cyber security publication CPO Magazine:

> To those unfamiliar with the world of fraud, driver's license numbers might seem like a relatively harmless piece of information to lose if it happens in isolation. Tim Sadler, CEO of email security firm Tessian, points out why this is not the case and why these numbers are very much sought after by cyber criminals: ". . . It's a gold mine for hackers. With a driver's license number, bad actors can manufacture fake IDs, slotting in the number for any form that requires ID verification, or use the

---

[22] Daniel Shkedi, *Heart of Darkness: Inside the Darknet Markets that Fuel Financial Cybercrime*, BIOCATCH BLOG (Dec. 5, 2018), https://web.archive.org/web/20210905231044/https://www.biocatch.com/blog/financial-cybercrime-darknet-markets.

[23] Gayle Sato, *What Should I Do If My Driver's License Number Is Stolen?*, EXPERIAN (Nov. 3, 2021) https://www.experian.com/blogs/ask-experian/what-should-i-do-if-my-drivers-license-number-is-stolen/ (last visited Apr. 8, 2024).

> information to craft curated social engineering phishing attacks. . . . bad actors may be using these driver's license numbers to fraudulently apply for unemployment benefits in someone else's name, a scam proving especially lucrative for hackers as unemployment numbers continue to soar. . . . In other cases, a scam using these driver's license numbers could look like an email that impersonates the DMV, requesting the person verify their driver's license number, car registration or insurance information, and then inserting a malicious link or attachment into the email."[24]

75. Further, an article on TechCrunch explains that it is driver's license or non-driver's identification numbers themselves that are the critical missing link for a fraudulent unemployment benefits application:

> Many financially driven criminals target government agencies using stolen identities or data. But many U.S. states require a government ID — like a driver's license — to file for unemployment benefits. To get a driver's license number, fraudsters take public or previously breached data and exploit weaknesses in auto insurance websites to obtain a customer's driver's license number. That allows the fraudsters to obtain unemployment benefits in another person's name.[25]

76. The use of stolen driver's license numbers to obtain unemployment benefits under another person's name was confirmed by the New York State DFS on February 16, 2021, in its industry letter described above, which stated that they had "recently learned of a systemic and aggressive campaign to exploit cybersecurity flaws in public-facing websites to steal [PI, including from] websites that provide an instant quote ... [and that] DFS has confirmed that, at least in some cases, this stolen information has been used to submit fraudulent claims for … unemployment benefits."[26]

77. On information and belief, the process that was used to extract the data from Defendants' website was likely automated: identity thieves have demonstrated the value they place

---

[24] Ikeda, *supra* note 15.
[25] Zach Whittaker, *Geico admits fraudsters stole customers' driver's license numbers for months*, TECHCRUNCH (Apr. 19, 2021), https://techcrunch.com/2021/04/19/geico-driver-license-numbers-scraped/#:~:text=To%20get%20a%20driver's%20license,benefits%20in%20another%20person's%20name.
[26] N.Y. DEP'T OF FIN. SERV., *supra* note 11.

on the driver's license numbers by engaging in a systematic and businesslike process for collecting them from Defendants' Data Disclosure and from additional insurers' websites offering instant quotes.

78. The United States Government Accountability Office noted in a June 2007 report on data breaches (the "GAO Report") that, when criminals use PI to open financial accounts, receive government benefits, and make purchases and secure credit in a victim's name, this type of identity fraud can be the most harmful because it may take some time for a victim to become aware of the fraud, and can adversely impact the victim's credit rating in the meantime.[27] The GAO Report also states that identity theft victims will face "substantial costs and inconveniences repairing damage to their credit records . . . [and their] good name."[28]

**G. Defendants Failed to Comply with Federal Trade Commission Requirements.**

79. Federal and state governments established security standards and issued recommendations to minimize unauthorized data disclosures, and knowing disclosures of information via public websites, and the resulting harm to individuals and financial institutions. The Federal Trade Commission (FTC) has promulgated numerous guides for businesses highlighting the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[29]

80. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and

---

[27] *See* U.S GOV'T ACCOUNTABILITY OFF., GAO-07-737, *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent is Unknown* (June 2007), http://www.gao.gov/assets/270/262899.pdf.
[28] *Id.* at 9.
[29] FED. TRADE COMM'N, *Start with Security: A Guide for Business* (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

practices for business.[30] Among other things, the guidelines note businesses should properly dispose of PI that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[31]

81. Also, the FTC recommends companies limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify third-party service providers have implemented reasonable security measures.[32]

82. Highlighting the importance of protecting against these types of disclosures, the FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PI, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[33]

83. Through intentionally designing and implementing their online quoting platform in a way that failed to secure Plaintiff's and Class Members' PI, Defendants knowingly allowed the

---

[30] *See* FED. TRADE COMM'N, *Protecting Personal Information: A Guide for Business* (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf.
[31] *Id.*
[32] *See* FED. TRADE COMM'N, *supra* note 29.
[33] *See* FED. TRADE COMM'N, *Privacy and Security Enforcement*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (follow "Press Releases" link).

public to utilize their online Quote Platform to obtain access to and collect individuals' PI. Defendants failed to employ reasonable and appropriate measures to protect against unauthorized disclosure and access to Plaintiff's and Class Members' PI. Defendants' data security policies and practices constitute unfair acts or practices prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45, and violate the Gramm-Leach-Bliley Act ("GLB Act"), 15 U.S.C. § 6801.

**H. Plaintiff's Injuries: Attempts to Secure PI After Defendants' Data Disclosure.**

84. Defendants admitted in the Notice that there was an exposure of Plaintiff's and Class Members' driver's license numbers. Defendants also concede that this disclosure created imminent harm to Plaintiff and Class Members, specifically warning Plaintiff and Class Members to take various mitigation steps and offering a year of credit monitoring. These measures are woefully inadequate and do not absolve Defendants of their violations of the DPPA and other laws alleged herein.

85. Plaintiff and Class Members have been, and will continue to be, injured because Defendants disclosed their PI, and—per Defendants' instructions— they are now forced to spend time monitoring their credit and governmental communications guarding against identity theft, and resolving fraudulent claims and charges because of Defendants' actions and/or inactions.

**I. Plaintiff and Class Members Suffered Additional Damages.**

86. Plaintiff and Class Members are at risk for actual identity theft in addition to all other forms of fraud.

87. The ramifications of Defendants' disclosure and failure to keep individuals' PI secure are long lasting and severe. Once PI is made available to unauthorized parties, fraudulent use of that information and damage to victims may continue for years.[34]

---

[34] LEXISNEXIS RISK SOLUTIONS, *True Cost of Fraud Studies*, https://risk.lexisnexis.com/insights-resources/research/us-ca-true-cost-of-fraud-study (last visited June 27, 2025).

88. Plaintiff's and Class Members' driver's license numbers are private, valuable, and sensitive in nature as they can be used to commit a lot of different harms and fraud in the hands of the wrong people. Defendants did not obtain Plaintiff's and Class Members' consent to disclose such PI to any other person, as required by applicable law and industry standards.

89. Defendants' decision to expose Plaintiff and Class Members to the possibility that anyone, especially thieves with various pieces of individuals' PI, could obtain any individual's driver's license number by utilizing Defendants' front-facing online instant quote platform left Plaintiff and Class Members with no ability to protect their sensitive and private PI.

90. Defendants had the resources necessary to prevent their Data Disclosure, but did not implement data security measures, despite their obligations to protect Plaintiff's and Class Members' PI from unauthorized disclosure.

91. Defendants failed to take reasonable steps to adequately secure their website and publish it in a manner that did not hand over Plaintiff's and Class Members' driver's license numbers to unauthorized third parties, leaving Defendants' customers and other consumers, including Plaintiff and Class Members, exposed to risk of fraud and identity theft.

92. Defendants were, and at all relevant times have been, aware that the PI they handle and store in connection with their services is highly sensitive. Because Defendants are companies that provide insurance services involving highly sensitive and identifying information, Defendants were aware of the importance of safeguarding that information and protecting their websites, systems, and products from security vulnerabilities.

93. Defendants were aware, or should have been aware, of regulatory and industry guidance regarding data security, and they were alerted to the risk associated with knowingly providing driver's license numbers to members of the public on Defendants' website.

94. Defendants knowingly obtained, used, disclosed, and compromised Plaintiff's and Class Members' PI by creating the Quote Platform with an auto-populate feature, voluntarily transmitting PI to any member of the public, including fraudulent actors. Defendants failed to take reasonable steps against an obvious threat. Defendants designed and implemented their own website, which included the instant quote feature that auto-populated Plaintiff's and Class Members' driver's license numbers in response to the input of basic publicly available consumer information—a feature that Defendants knowingly and intentionally included on their website. Had Defendants never used the information to sell auto insurance or never included this feature on their sales platform, they would have prevented the disclosure, unauthorized access, and ultimately, the prospective fraudulent use and possible fraudulent use of consumers' PI.

95. As a direct and proximate result of Defendants' actions and inactions, Plaintiff and Class Members have been placed at an imminent, immediate, and continuing increased risk of harm from identity theft and fraud, requiring them to take the time which they otherwise would have dedicated to other life demands such as work and family in an effort to mitigate the actual and potential impact of Defendants' Data Disclosure on their lives.

96. The U.S. Department of Justice's Bureau of Justice Statistics found that "among victims who had personal information used for fraudulent purposes, 29% spent a month or more resolving problems" and that "resolving the problems caused by identity theft [could] take more than a year for some victims."[35]

97. As a result of Defendants' Data Disclosure, Plaintiff and Class Members have suffered, will suffer, and are at imminent risk of suffering:

---

[35] Erika Harrell and Lynn Langton, *Victims of Identity Theft, 2012*, NCJ 243779, U.S. DEP'T OF JUSTICE, OFF. OF JUSTICE PROGRAMS, BUREAU OF JUSTICE STATISTICS (Dec. 2013), https://bjs.ojp.gov/content/pub/pdf/vit12.pdf.

a. the compromise, publication, fraudulent, and/or unauthorized use of their PI;

b. out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

c. lost opportunity costs and wages and loss of productivity associated with efforts expended from addressing and attempting to mitigate the actual and future consequences of Defendants' Data Disclosure, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

d. the continued risk to their PI, which remains in the possession of Defendants and is subject to further compromise so long as Defendants fail to undertake appropriate measures to protect the PI in their possession; and

e. current and future costs in terms of time, effort, and money that will be expended to prevent, detect, contest, remediate, and repair the impact of Defendants' Data Disclosure for the remainder of the lives of Plaintiff and Class Members.

98. In addition to a remedy for the economic harm, Plaintiff and Class Members maintain an undeniable interest in ensuring that their PI is secure, remains secure, and is not subject to further disclosure, misappropriation, and theft.

99. To date, other than providing 12 months of credit monitoring and identity protection services, Defendants do not appear to be taking any measures to assist Plaintiff and Class Members.

100. Defendants' disclosure of Plaintiff's and Class Members' driver's license numbers directly to members of the public (with small amounts of their PI) has resulted in Plaintiff and

Class Members having to undertake mitigation tasks, which require extensive amounts of time, calls, and, for many of the credit and fraud protection services, payment of money. Indeed, as Defendants' Notice indicates, they are putting the burden on Plaintiff and Class Members to discover possible fraudulent activity and identity theft.

101. Defendants' offer of 12 months of identity monitoring and identity protection services to Plaintiff and Class Members is woefully inadequate.

102. Identity theft victims are frequently required to spend many hours and large amounts of money repairing the impact to their credit. Identity thieves use stolen PI for a variety of crimes, including credit card fraud, tax fraud, phone or utilities fraud, and bank/finance fraud.

103. There may be a time lag between when additional harm occurs versus when it is discovered, and between when PI is acquired and when it is used. According to the GAO Report:

> [L]aw enforcement officials told us that in some cases, *stolen data may be held for up to a year or more before being used to commit identity theft*. Further, once stolen data have been sold or posted on the Web, *fraudulent use of that information may continue for years*. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[36]

104. As a result of the events detailed herein, Plaintiff and Class Members suffered harm and loss of privacy, and will continue to suffer future harm, because of Defendants' Data Disclosure and the fact that their driver's license numbers have been exposed to the public, (including potential criminals), including but not limited to: invasion of privacy; loss of privacy; loss of control over PI and identities; fraud and identity theft; unreimbursed losses relating to fraud and identity theft; loss of value and loss of possession and privacy of PI; harm resulting from damaged credit scores and credit information; a substantially increased risk of future identity theft and fraud; loss of time and money preparing for and resolving fraud and identity theft; loss of time

[36] *See* GAO Report 07-737, *supra* note 27, at 29 (emphasis added).

and money obtaining protections against future identity theft; and other harm resulting from the unauthorized use or threat of unauthorized disclosure of PI.

## CLASS ALLEGATIONS

105. Plaintiff brings this action individually and on behalf of the following Class pursuant to Federal Rule of Civil Procedure 23(a) and (b):

> **Nationwide Class**:
> All residents of the United States whose driver's license number was obtained, used, and/or disclosed by Defendants through their website, including, but not limited to, during the Data Disclosure.

106. Plaintiff reserves the right to re-define the Class prior to class certification. Plaintiff reserves the right to modify this class definition as discovery in this action progresses.

107. Excluded from the Class are Defendants and their affiliates, officers, directors, assigns, successors, and the Judge(s) assigned to this case.

108. **Numerosity**: While the precise number of Class Members has not yet been determined, members of the Class are so numerous that their individual joinder is impracticable, as the proposed Class appears to include at least hundreds of thousands of members who are geographically dispersed.

109. **Typicality**: Plaintiff's claims are typical of Class Members' claims. Plaintiff and all Class Members were injured through Defendants' uniform misconduct, and Plaintiff's claims are identical to the claims of the Class Members they seek to represent. Accordingly, Plaintiff's claims are typical of Class Members' claims.

110. **Adequacy**: Plaintiff is an adequate representative of the Class because Plaintiff's interests are aligned with the Class Plaintiff seeks to represent, and there are no conflicts of interest with the Class. Plaintiff's counsel are competent with significant experience prosecuting complex class action cases, including cases involving alleged privacy and data security violations. Plaintiff

and Plaintiff's counsel intend to prosecute this action vigorously. The Class's interests are well-represented by Plaintiff and Plaintiff's counsel.

111. **Superiority**: A class action is the superior—and only realistic—mechanism to fairly and efficiently adjudicate Plaintiff's and other Class Members' claims. The injury suffered by each individual Class Member is relatively small in comparison to the burden and expense of individual prosecution of complex and expensive litigation. It would be very difficult if not impossible for Class Members individually to effectively redress Defendants' wrongdoing. Even if Class Members could afford such individual litigation, the court system could not. Individualized litigation also presents a potential for inconsistent or contradictory judgments. Individualized litigation further increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

112. **Commonality and Predominance**: The following questions common to all Class Members predominate over any potential questions affecting individual Class Members:

a. whether Defendants engaged in the wrongful conduct alleged herein;

b. whether Defendants knowingly used Plaintiff's and the Class Members' driver's license numbers to promote and sell auto insurance;

c. whether Defendants knowingly disclosed Plaintiff's and the Class Members' driver's license numbers;

d. whether Defendants violated the DPPA;

e. whether Defendants' data security practices and the vulnerabilities of Defendants' systems resulted in the disclosure of Plaintiff's and other Class Members' sensitive information;

f. whether Defendants violated Plaintiff's and the Class Members' privacy rights;

g. whether Defendants were negligent or negligent per se when they disclosed the sensitive information of Plaintiff and other Class Members; and

h. whether Plaintiff and Class Members are entitled to damages, equitable relief, or other relief and, if so, in what amount.

113. Given that Defendants engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and common law and statutory violations are involved, and common questions outweigh any potential individual questions.

## CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE DRIVER'S PRIVACY PROTECTION ACT, 18 U.S.C. §§ 2724, *ET SEQ.*
### (On Behalf of Plaintiff and the Class, Against All Defendants)

114. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

115. Plaintiff brings this claim individually and on behalf of the Class.

116. The DPPA provides that "[a] person who knowingly obtains, discloses or uses personal information, from a motor vehicle record, for a purpose not permitted under this chapter shall be liable to the individual to whom the information pertains . . . ." 18 U.S.C. § 2724.

117. The DPPA also restricts the resale and redisclosure of personal information, and requires authorized recipients to maintain records of each individual and the permitted purpose of the disclosure for a period of five years. 18 U.S.C. § 2721(c).

118. Under the DPPA, a "'motor vehicle record' means any record that pertains to a motor vehicle operator's permit, motor vehicle title, motor vehicle registration, or identification

card issued by a department of motor vehicles." 18 U.S.C. § 2725(1). Driver's license numbers are motor vehicle records and "personal information" under the DPPA. 18 U.S.C. § 2725(3).

119. Defendants obtain, use, and disclose motor vehicle records from their customers.

120. Defendants also obtain motor vehicle records directly from state agencies or through resellers (third-party prefill services) who sell such records.

121. Defendants knowingly used the above-described information to sell auto insurance on their free online Quote Platform, accessible from www.lemonade.com.

122. Defendants knowingly published the above-described information to the public on their free online Quote Platform, accessible from www.lemonade.com.

123. Defendants knowingly linked their respective public websites to systems and/or networks storing maintaining, and/or obtaining Plaintiff's and Class Members' PI.

124. Defendants had a practice of offering online insurance quotes to applicants before they incorporated this auto-population feature, but added the auto-population feature to their online Quote Platform in order to gain competitive advantage in their sales process. By adding the auto-population feature to their online Quote Platform, which Defendants knowingly chose to do, Defendants knew that they were using the driver's license information to sell insurance and making the displayed information easily accessible to anyone who entered basic information into their system. Defendants did not impose any security protocols to ensure that website visitors entered and accessed PI only about themselves. Defendants did not impose effective security protocols to prevent automated bots from accessing consumers' PI.

125. During the time period up until, at the earliest, September 2024, PI, including driver's license numbers, of Plaintiff and Class Members, were publicly available and viewable on Defendants' Quote Platform, and Defendants knowingly obtained, used, and disclosed and/or

redisclosed Plaintiff's and Class Members' motor vehicle records and PI to the general public, which is not an authorized use permitted by the DPPA pursuant to 18 U.S.C. §§ 2724, 2721(b), and 2721(c).

126. Pursuant to the allegations herein, Defendants knew or should have known that they obtained, disclosed or re-disclosed, and used PI from a motor vehicle record for a purpose not permitted under the DPPA.

127. By engaging in the conduct described above, Defendants knowingly obtained personal information for a purpose not permitted under the DPPA.

128. By engaging in the conduct described above, Defendants knowingly used personal information for a purpose not permitted under the DPPA.

129. By engaging in the conduct described above, Defendants knowingly disclosed or re-disclosed personal information for a purpose not permitted under the DPPA.

130. As a result of Defendants' acquisition, use, subsequent Data Disclosure, and violations of the DPPA, Plaintiff and putative Class Members are entitled to statutory damages to maximum allowable, actual damages, liquidated damages, and attorneys' fees and costs.

**COUNT II**
**NEGLIGENCE**
**(On Behalf of Plaintiff and the Class, Against All Defendants)**

131. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

132. Plaintiff brings this claim individually and on behalf of the Class.

133. Defendants owed a duty to Plaintiff and Class Members to exercise reasonable care in obtaining, securing, safeguarding, storing, and protecting Plaintiff's and Class Members' PI from being compromised, lost, stolen, and accessed by unauthorized persons. This duty includes,

among other things, designing, implementing, maintaining, and testing their data security systems to ensure Plaintiff's and Class Members' PI in Defendants' possession, or that could be accessed by Defendants, was adequately secured and protected.

134. Defendants owed a duty to Plaintiff and Class Members to adopt, implement, and maintain a process by which they could detect vulnerabilities in their websites and systems in a reasonably expeditious period of time and to give prompt notice in the case of a data security incident, including any unauthorized use of data knowingly disclosed on Defendants' website.

135. Defendants owed a duty of care to Plaintiff and Class Members to provide security, consistent with industry standards, to ensure that their systems and networks—and the personnel responsible for them—adequately protected the PI it stored, maintained, used, accessed, and/or obtained.

136. Defendants further assumed the duty to implement reasonable security measures as a result of their general conduct, internal policies, and procedures. By receiving Plaintiff's and Class Members' PI, Defendants specifically assumed the duty to comply with industry standards in protecting that and other consumers' PI, and to adopt, implement, and maintain internal standards of data security that met those industry standards.

137. Unbeknownst to Plaintiff and Class Members, they were entrusting Defendants with their PI when Defendants obtained their PI from motor vehicle records directly from state agencies or through resellers or third-party prefill services who sell such records. Defendants had an obligation to safeguard Plaintiff's and Class Members' PI and were able to protect against the harm suffered by Plaintiff and Class Members. Instead, Defendants chose to disclose Plaintiff's and Class Members' driver's license numbers so they could sell more auto insurance.

138. Defendants owed a duty of care to Plaintiff and Class Members because they were foreseeable and probable victims of any inadequate data security practices. Defendants knew or should have known of the inherent risks in having their systems auto-populate online quote requests with private PI without the consent or authorization of the person whose PI was being provided. Only Defendants were in a position to ensure that their systems were sufficient to protect against harm to Plaintiff and the Class resulting from a data security incident, instead they chose to disclose Plaintiff's and Class Members' driver's license numbers so they could sell more auto insurance.

139. Defendants' own conduct also created a foreseeable risk of harm to Plaintiff and Class Members and their PI. Defendants' misconduct included failing to adopt, implement, and maintain the systems, policies, and procedures necessary to prevent disclosure of PI, and instead chose to disclose Plaintiff's and Class Members' driver's license numbers.

140. Defendants acknowledge their conduct created actual harm to Plaintiff and Class Members because Defendants instructed them to monitor their accounts for fraudulent conduct and identity theft, and offered one year of credit monitoring.

141. Defendants knew, or should have known, of the risks inherent in disclosing, collecting, storing, accessing, and transmitting PI and the importance of adequate security. Defendants knew about—or should have been aware of—numerous, well-publicized unauthorized data disclosures affecting businesses, especially insurance and financial businesses, in the United States.

142. Because Defendants knew that their disclosure of sensitive PI would damage thousands of individuals, including Plaintiff and Class Members, Defendants had a duty to adequately protect their data systems and the PI contained and/or accessible therein.

143. Defendants breached their duties to Plaintiff and Class Members, and thus were negligent, by designing the Quote Platform and website so that it automatically provided Plaintiff's and Class Members' driver's license information directly to members of the public, failing to recognize in a timely manner that Plaintiff's and Class Members' PI had been disclosed, and failing to warn Plaintiff and Class Members in a timely manner that their PI had been disclosed.

144. But for Defendants' wrongful and negligent breach of their duties owed to Plaintiff and Class Members, Plaintiff and Class Members would not have been injured.

145. The injury and harm suffered by Plaintiff and Class Members was the reasonably foreseeable result of Defendants' breach of their duties. Defendants knew or should have known they were failing to meet their duties, and that the Defendants' breach would cause Plaintiff and Class Members to experience the foreseeable harms associated with the disclosure of their PI.

146. Neither Plaintiff nor the other Class Members contributed to Defendants' Data Disclosure.

147. As a direct and proximate cause of Defendants' conduct, Plaintiff and Class Members have suffered and/or will suffer injury and damages, including, but not limited to: (i) the loss of the opportunity to determine for themselves how their PI is used; (ii) the publication and/or fraudulent use of their PI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PI; (iv) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of Defendants' Data Disclosure, including, but not limited to, efforts spent researching how to prevent, detect, contest and recover from unemployment and/or tax fraud and identity theft; (v) costs associated with placing freezes on credit reports; (vi) anxiety, emotional distress, loss of privacy, and other economic and non-economic losses; (vii) the continued risk to

their PI, which remains in Defendants' possession (and/or to which Defendants continue to have access) and is subject to further unauthorized disclosures so long as Defendants fail to undertake appropriate and adequate measures to protect the PI in their continued possession; and (viii) future costs in terms of time, effort and money that will be expended to prevent, detect, contest, and repair the inevitable and continuing consequences of disclosed PI.

148. Defendants acted with wanton disregard for the security of Plaintiff's and Class Members' PI.

149. Plaintiff and Class Members have suffered injury and are entitled to damages in an amount to be proven at trial.

**COUNT III**
**INVASION OF PRIVACY**
**(On Behalf of Plaintiff and the Class, Against All Defendants)**

150. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

151. Plaintiff brings this claim individually and on behalf of the Class.

152. Plaintiff's and Class Members' driver's license numbers and the other personally identifying information obtained and disclosed by Defendants during the Data Disclosure was of a private, secluded, and highly personal nature.

153. Plaintiff and Class Members had a reasonable expectation of privacy in the PI that Defendants disclosed without authorization.

154. By knowingly using and disclosing Plaintiff's and Class Members' PI, failing to keep Plaintiff's and Class Members' PI safe, and utilizing unsecure systems, Defendants unlawfully invaded Plaintiff's and Class Members' privacy by, *inter alia*:

a. intruding into Plaintiff's and Class Members' private affairs in a manner that would be highly offensive to a reasonable person;

b. invading Plaintiff's and Class Members' privacy by improperly using their PI properly obtained for a specific purpose for another purpose, or disclosing it to the public and/or a third party;

c. failing to adequately secure Plaintiff's and Class Members' PI from disclosure to unauthorized persons; and

d. enabling the disclosure of Plaintiff's and Class Members' PI without consent.

155. Defendants obtaining Plaintiff's driver's license numbers and other PI about Plaintiff was an unreasonable, substantial, and serious invasion of Plaintiff's privacy and constituted an intrusion on Plaintiff's seclusion. Defendants had no legitimate basis to obtain Plaintiff's private information.

156. Defendants knew, or acted with reckless disregard of the fact that a reasonable person in Plaintiff's and Class Members' position would consider their actions highly offensive.

157. Defendants' disclosure of Plaintiff's driver's license numbers to nefarious third parties was an unreasonable, substantial, and serious invasion of Plaintiff's privacy and constituted an intrusion on Plaintiff's seclusion. Defendants had no legitimate basis to disclose Plaintiff's private information to nefarious third parties.

158. As a proximate result of Defendants' Data Disclosure, Plaintiff's and Class Members' reasonable expectations of privacy in their PI was unduly frustrated and thwarted. Defendants' conduct amounted to a serious invasion of Plaintiff's and Class Members' protected privacy interests.

159. As a result of Defendants' obtaining and disclosing their private information, Plaintiff have suffered injuries and are entitled to compensation.

**COUNT IV**
**VIOLATIONS OF NEW YORK GENERAL BUSINESS LAW § 349**
**(On Behalf of Plaintiff and the Class, Against All Defendants)**

160. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

161. Plaintiff brings this claim individually and on behalf of the Class.

162. Section 349 of the New York GBL provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349(a).

163. Defendants, while operating in New York, engaged in deceptive acts and practices in the conduct of business, trade and commerce, and the furnishing of services, in violation of N.Y. Gen. Bus. Law § 349(a). This includes, but is not limited to, the following:

a. disclosing Plaintiff's and Class Members' PI;

b. failing to enact adequate privacy and security measures to protect Plaintiff's and Class Members' PI from unauthorized disclosure, release, and theft;

c. failing to take proper action following known security risks and prior cybersecurity incidents;

d. knowingly and fraudulently providing Plaintiff's and Class Members' driver's license information directly to members of the public with small amounts of their PI;

e. omitting, suppressing, and concealing the inadequacy of Defendants' security protections;

f. knowingly and fraudulently misrepresenting that Defendants would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of PI; and

g. failing to disclose their Data Disclosure to the victims in a timely and accurate manner, in violation of the duties imposed by, *inter alia*, N.Y. Gen. Bus. Law § 899-aa(2).

164. As a direct and proximate result of Defendants' practices, including its Data Disclosure, Plaintiff and other Class Members suffered injury and/or damages, including, but not limited to, misuse of their PI, fraud, and identity theft; lost time and expenses related to monitoring their accounts for fraudulent activity; an increased, imminent risk of fraud and identity theft; and loss of value of their PI.

165. The above unfair and deceptive practices and acts by Defendants were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Plaintiff and other Class Members that they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

166. In view of its decision to disclose the PI in its Data Disclosure, Defendants knew or should have known that their systems and data security practices were inadequate to safeguard the PI entrusted to them, and that risk of fraudsters obtaining the PI was highly likely.

167. Defendants' actions in engaging in the above-named unfair practices and deceptive acts, including Defendants' Data Disclosure, were knowing and willful.

168. Plaintiff and Class Members seek relief under N.Y. Gen. Bus. Law § 349(h), including, but not limited to, actual damages (to be proven at trial), treble damages, statutory damages, injunctive relief, and/or attorneys' fees and costs.

169. Plaintiff and Class Members seek to enjoin such unlawful deceptive acts and practices described above. Each Class Member will be irreparably harmed unless the Court enjoins

Defendants' unlawful, deceptive actions, in that Defendants will continue to fail to protect the PI entrusted to them, as detailed herein.

170. Plaintiff and Class Members seek declaratory relief, restitution for monies wrongfully obtained, disgorgement of ill-gotten revenues and/or profits, injunctive relief prohibiting Defendants from continuing to disseminate its false and misleading statements, and other relief allowable under N.Y. Gen. Bus. Law § 349.

## COUNT V
## DECLARATORY AND INJUNCTIVE RELIEF
## (On Behalf of Plaintiff and the Class, Against All Defendants)

171. Plaintiff realleges and incorporates all previous allegations as though fully set forth herein.

172. Plaintiff brings this claim individually and on behalf of the Class.

173. As previously alleged, Plaintiff and Class Members have a reasonable expectation that companies such as Defendants, who could access their PI through automated systems, would provide adequate security for that PI.

174. Defendants owe a duty of care to Plaintiff and Class Members requiring them to adequately secure PI.

175. Defendants still possess and can still access PI regarding Plaintiff and Class Members.

176. Since their Data Disclosure, Defendants have announced few, if any changes to their decision to disclose the PI, their data security infrastructure, and processes or procedures to fix the vulnerabilities in their computer systems or Quote Platform.

177. Defendants' Data Disclosure caused actual harm because of Defendants' failure to fulfill their duties of care to provide security measures to Plaintiff and Class Members. Further,

Plaintiff and Class Members are at risk of additional or further harm due to the exposure of their PI and Defendants' failure to address the security failings that led to such exposure.

178. There is no reason to believe that Defendants' security measures are more adequate now to meet Defendants' legal duties than they were before their Data Disclosure.

179. Plaintiff therefore seeks a declaration (1) that Defendants' existing security measures do not comply with their duties of care to provide adequate security, and (2) that to comply with their duties of care, Defendants must implement and maintain reasonable security measures, including, but not limited to:

a. ordering Defendants not to disclose PI, including driver's license information, to the general public through their website or sales platforms;

b. ordering Defendants to engage third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated inquiries by bots, simulated cyberattacks, penetration tests, and audits on Defendants' systems on a periodic basis, and ordering Defendants to promptly correct any problems or issues detected by such third-party security auditors;

c. ordering Defendants to engage third–party security auditors and internal personnel to run automated security monitoring, including risk analysis on Defendants' decision making;

d. ordering Defendants to audit, test, and train their security personnel regarding any new or modified procedures;

e. ordering Defendants not to make PI available on their Quote Platform;

f. ordering Defendants not to store PI or make PI accessible in any publicly facing website;

g. ordering Defendants to purge, delete, and destroy in a reasonably secure manner customer and consumer data not necessary for their provisions of services;

h. ordering Defendants to conduct regular computer system scanning and security checks; and

i. ordering Defendants to routinely and continually conduct internal training and education to inform employees and officers on PI security risks, internal security personnel how to identify and contain a disclosure when it occurs, and what to do in response to a data security incident.

## PRAYER FOR RELIEF

Plaintiff, individually and on behalf of the Class, by and through undersigned counsel, respectfully requests that the Court grant the following relief:

A. certify this case as a class action pursuant to Fed. R. Civ. P. 23, and appoint Plaintiff as the class representatives and Plaintiff's counsel as class counsel;

B. award Plaintiff and Class Members actual, statutory, punitive, monetary, and nominal damages to the maximum extent allowable;

C. award declaratory and injunctive relief as permitted by law or equity to assure that Class Members have an effective remedy, including enjoining Defendants from continuing the unlawful practices as set forth above;

D. award Plaintiff and Class Members pre-judgment and post-judgment interest to the maximum extent allowable;

E. award Plaintiff and Class Members reasonable attorneys' fees, costs, and expenses, as allowable; and

F. award Plaintiff and Class Members such other favorable relief as allowable under law or at equity.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: July 2, 2025

Respectfully submitted,

*/s/ Melissa Clark*
Melissa R. Clark
**AHDOOT & WOLFSON, PC**
521 5th Avenue, 17th Floor
New York, NY 10175
Telephone: (917) 336-0171
Facsimile: (917) 336-0177
mclark@ahdootwolfson.com

Andrew W. Ferich (*pro hac vice* to be filed)
**AHDOOT & WOLFSON, PC**
201 King of Prussia Road, Suite 650
Radnor, PA 19087
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
aferich@ahdootwolfson.com

Robert Ahdoot (*pro hac vice* to be filed)
Alyssa Brown (*pro hac vice* to be filed)
**AHDOOT & WOLFSON, PC**
2600 W. Olive Avenue, Suite 500
Burbank, CA 91505
Telephone: (310) 474-9111
Facsimile: (310) 474-8585
rahdoot@ahdootwolfson.com
abrown@ahdootwolfson.com

*Counsel for Plaintiff Gregory Klein and the Putative Class*